**Affirmed and Opinion Filed December 5, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-20-00915-CV

---

### JAMES R. SNELL, Appellant
### V.
### BEHAVIORAL HEALTH CONNECTIONS, INC.,
### UHS OF TIMBERLAWN, INC., UNIVERSAL HEALTH SERVICES, INC.,
### AND HEATHER CAWTHON, Appellees

---

### On Appeal from the 44th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-19-15454

---

## MEMORANDUM OPINION
Before Justices Myers, Molberg, and Garcia
Opinion by Justice Molberg

Appellant James R. Snell appeals a take-nothing judgment on his false

imprisonment, invasion of privacy, assault and battery, and DTPA[1] claims against

appellees Behavioral Health Connections, Inc. (BHC), UHS of Timberlawn, Inc.

(Timberlawn), Universal Health Services, Inc. (UHS), and Heather Cawthon. Snell

argues the trial court erred by denying his motion for summary judgment as to

---

[1] *See* TEX. BUS. & COM. CODE §§ 17.41–.63 (Deceptive Trade Practices Act (DTPA)).

liability on his false imprisonment claims and by dismissing his claims for failing to serve an expert report under the Texas Medical Liability Act (TMLA).[2] For the reasons that follow, we affirm the trial court's take-nothing judgment in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## I. BACKGROUND[3]

According to Snell:

> Early on the morning of December 9, 2018, [he] became verbally active, seeming disoriented and confused while a pedestrian on a residential street in his neighborhood, possibly due to side effects from a prescription anti-inflammatory medication. Someone contacted police[,] who called paramedics, [and who, in turn,] gave [him] a drug that put him to sleep [and] took him to the emergency room at Baylor Hospital in Dallas.

> While at Baylor, Snell first met Cawthon, a licensed professional counselor.

Snell's lawsuit concerns events that began with the hospital-room conversation between Cawthon and Snell on December 9, 2018, and concluded with Snell's December 27, 2018 discharge from a mental health facility.

Snell claims during the seventeen-day period between those two dates, he was illegally held and effectively "imprisoned" at the facility. He also claims he was physically restrained and forcibly medicated on two of those dates.

On appeal, quoting his own pleading, Snell identified his principal claim as this: "[Appellees], le[d] by UHS, engaged in an unconscionable course of conduct

---

[2] *See* TEX. CIV. PRAC. & REM. CODE §§ 74.001–.507 (TMLA); *id*. § 74.351 (expert reports).

[3] The facts are well known to the parties, and we do not recite them except as necessary "to advise the parties of the court's decision and the basic reasons for it." TEX. R. APP. P. 47.4.

. . . to first obtain [him] for detention . . . and then continued detaining him for [seventeen] days, [fourteen] of them without even a semblance of legal right for doing so."

Thus, the heart of Snell's lawsuit is the legality of appellees' actions surrounding his involuntary commitment, an issue largely controlled by Chapter 574 of the Mental Health Code,[4] which Snell cites many times in his pleading.

Snell sued BHC, UHS, and Cawthon in September 2019, asserting claims for false imprisonment, invasion of privacy, and assault and battery in connection with the December 2018 events. His original petition alleged, in part:

> As result of the illegal acts of [BHC, UHS, and Cawthon], [Snell] was first labeled dangerous, then detained against his will for 17 days at a mental health facility. For those 17 days, his right to regularly communicate with associates, friends, and family was cut off. He was treated as incompetent. He was confined inside a mental health ward that resembled a prison, not a hospital.

> [Snell] was humiliated and ridiculed, particularly for protesting that he was being falsely imprisoned. He was assaulted and drugged. He suffered physically and mentally. When he finally was released, it took months for him to feel "normal" again. The memory and consequences of his ordeal still reduce the quality of his daily life.

> This case concerns the utter disregard for laws and procedures put in place by the State of Texas that protect people from being wrongly committed to mental health facilities against their will. This is a false imprisonment, assault, and invasion of privacy case based on [BHC, UHS, and Cawthon's] violation of those laws.

---

[4] *See* TEX. HEALTH & SAFETY CODE §§ 571.001–578.008 (Mental Health Code); *id*. §§ 574.001–.203 (Chapter 574, which addresses court-ordered mental health services).

In February 2020, Snell amended his petition, adding Timberlawn as a defendant and adding a DTPA claim against all appellees. Snell's amended petition asserted the same four claims against all four appellees—false imprisonment, invasion of privacy, assault and battery, and DTPA violations—all in connection with the December 2018 events. In his amended petition, Snell claimed, for the seventeen days between December 9, 2018, and December 27, 2018, appellees "involuntarily detained [and] in effect imprisoned" him, "the first three days without the requisite factual showing and for [fourteen] more days without legal authority of any kind."

In terms of the relationships between the parties, Snell's amended petition identified Cawthon as a licensed professional counselor and BHC employee, Timberlawn as the owner of the mental health facility from which he was discharged, UHS as the largest provider of facility-based mental health services in the United States, and BHC and Timberlawn as wholly-owned UHS subsidiaries.

Each appellee answered. BHC, UHS, and Cawthon filed an answer on October 18, 2019, and Timberlawn filing an answer on March 11, 2020.

In those answers, appellees generally denied Snell's allegations, stated the procedures and services performed were at all times and in all respects in conformity with the applicable standard of care, identified appellees as healthcare providers as

–4–

defined by TMLA section 74.001(12),[5] stated the case is subject to the TMLA, and invoked the TMLA's provisions.

On February 20, 2020, more than 120 days after BHC, UHS, and Cawthon answered, and five days prior to Snell's filing of his amended petition, BHC, UHS, and Cawthon filed a motion to dismiss Snell's claims. Appellees argued Snell's claims constitute health care liability claims (HCLCs)[6] under the TMLA, asked the trial court to dismiss his claims with prejudice for his failure to serve expert reports under TMLA section 74.351,[7] and asked for attorneys' fees and costs.[8] Snell opposed that motion to dismiss and argued the TMLA does not apply. Snell did not submit any evidence to accompany his response.[9]

On April 10, 2020, the trial court granted BHC, UHS, and Cawthon's motion to dismiss and scheduled a hearing for a determination on attorneys' fees.

On April 28, 2020, Snell filed several items, including a motion to set aside the dismissal of his false imprisonment claims against BHC, UHS, and Cawthon and two separate summary judgment motions to establish liability on his false imprisonment claims, with one motion on his false imprisonment claims against BHC, UHS, and Cawthon—even though those claims had by then been dismissed—

---

[5] *See* TEX. CIV. PRAC. & REM. CODE § 74.001(12) (defining "health care provider" under TMLA).

[6] *See* TEX. CIV. PRAC. & REM. CODE § 74.001(13) (defining "health care liability claim" under TMLA).

[7] *See* TEX. CIV. PRAC. & REM. CODE § 74.351 (TMLA expert report requirements).

[8] BHC, UHS, and Cawthon attached an attorneys' fee affidavit to their motion to dismiss.

[9] The docket sheet reflects that the trial court held a hearing on BHC, UHS, and Cawthon's motion to dismiss. The record contains no hearing transcript and no indication the court admitted any evidence.

–5–

and another motion on his false imprisonment claims against Timberlawn. The trial court denied Snell's April 28, 2020 filings on June 19, 2020.

On August 11, 2020, more than 120 days after it filed an answer, Timberlawn filed a motion to dismiss Snell's claims, arguing, as BHC, UHS, and Cawthon had, that Snell's claims constitute HCLCs under the TMLA. Timberlawn asked the trial court to dismiss his claims with prejudice for his failure to serve an expert report under TMLA section 74.351[10] and asked the court to award attorneys' fees and costs to Timberlawn.[11] Snell opposed Timberlawn's motion and argued the TMLA does not apply. Snell did not submit any evidence to accompany his response, and none was admitted, at least according to the record before us.[12]

The trial court granted Timberlawn's motion to dismiss , as it had done with BHC, UHS, and Cawthon's earlier motion. The court's order also indicated TMLA section 74.351(b)(1) mandates an award of reasonable attorneys' fees and court costs and noted these were to be assessed at time of final judgment.

On October 5, 2020, the trial court entered a final take-nothing judgment on Snell's claims and awarded certain attorneys' fees and costs of court to appellees.

Snell timely appealed.

---

[10] *See* TEX. CIV. PRAC. & REM. CODE § 74.351.

[11] Timberlawn attached an attorneys' fees affidavit to its motion.

[12] The record is not entirely clear on whether the trial court held a hearing on Timberlawn's motion to dismiss or if it was decided by submission. The record contains no hearing transcript and no indication the court admitted any evidence.

## II. ISSUES AND ANALYSIS

In the "Issues Presented" section of his brief, Snell lists three topics,[13] each relating to one central question: did the trial court err in dismissing Snell's claims against appellees for his failure to serve an expert report under the TMLA? Snell argues the trial court did so but also argues the trial court erred by denying his summary judgment motions as to liability on his false imprisonment claims. We address both of Snell's arguments below.[14]

### A.    Summary Judgment Denial

As indicated, Snell argues the trial court erred by denying his motions for summary judgment as to liability on his false imprisonment claims. Appellees argue, in part, that Snell "lacks standing" to appeal the trial court's denial of his summary judgment motions because summary judgment denials are generally not reviewable,

---

[13] Snell's "Issues Presented" section states:

1. Whether a mental health provider in the absence of consent to render treatment can confine a Texas citizen against his will, then require the "patient" to present an expert report showing negligence in the provider's conduct.

2. Whether the filing of an Application for Court-Ordered Mental Health Services under the Texas Mental Health Code commencing a case in a probate court represents an act of "health care."

3. Whether intentional tort claims brought against a mental health provider for violations of the Texas Mental Health Code and the Texas Deceptive Trade Practices Act require compliance with Chapter 74's expert report requirement.

[14] *See* TEX. R. APP. P. 38.9; *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012) ("An appellant can preserve error 'in the body of their appellate brief,' even if it is not separately listed in the notice of appeal or presented as an issue in the brief.") (citation omitted); *Davis Apparel v. Gale-Sobel, a Div. of Angelica Corp.*, 117 S.W.3d 15, 19 (Tex. App.—Eastland 2003, no pet.) (noting that, under the liberal rules of construction applicable to briefs, court could consider appellant's alternative argument pertaining to trial court's ruling on an issue not expressly stated in its appellate issues).

and they cite as support *United Parcel Service v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App—Houston [14th Dist.] 2000, pet. denied).

Snell argues that case does not apply because the general rule to which it refers[15] involves situations in which a party has appealed the denial of a motion for summary judgment after a trial on the merits, a situation not present here.  Instead, Snell likens this case to cases where appellate courts have considered the denial of an appellant's motion for summary judgment when both parties have moved for summary judgment, and he cites as support *Cincinnati Life Insurance Company v. Cates*, 927 S.W.2d 625 (Tex. 1996); *Holmes v. Morales*, 924 S.W.2d 920 (Tex. 1996); and *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988).  Those cases are distinguishable, as only one party moved for summary judgment in this case.

Though Snell does not cite it, the case originating the principle upon which Snell relies is *Tobin v. Garcia*, 316 S.W.2d 396 (Tex. 1958).  The court stated:

> As noted above, plaintiffs filed a motion for summary judgment in the trial court which was overruled.  In *Rogers v. Royalty Pooling Co.*, [302 S.W.2d 938 (Tex. 1957)], where both parties filed motions for summary judgment, and the trial court granted one motion and overruled the other, this court held that in an appeal from the order granting a summary judgment, the Court of Civil Appeals could not review the order of the trial court overruling the other motion.
>
> After a careful consideration of the matter we have come to the conclusion that that case should be overruled.  If the only order in the trial court is one overruling a motion for summary judgment, then that order is interlocutory and no appeal will lie therefrom.  But when, as in this case, both parties file motions for summary judgment and one such

[15] *See United Parcel Service*, 25 S.W.3d at 916 ("The general rule is that a denial of a summary judgment cannot be reviewed on appeal.").

–8–

motion is granted, then the trial court's judgment becomes final and appealable, and on appeal the Court of Civil Appeals should determine all questions presented. If reversible error is found, the court should render such judgment as the trial court should have rendered . . . and if the case is brought to this court and the judgment of the Court of Civil Appeals is reversed, we should render such judgment as that court should have rendered. . . . *Rogers v. Royalty Pooling Co.* is overruled.

*Tobin*, 316 S.W.2d at 400–01. But as later explained in *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966), the *Tobin* exception has limits, particularly in cases following a final judgment or order of dismissal. The court stated:

Undoubtedly, the rule of practice adopted by [*Tobin v. Garcia*] is an exception to the general rule that an order overruling a motion for summary judgment is not subject to review upon appeal. . . . Such rule was recognized in the interest of the prompt disposal of causes and its operation has generally been attended with satisfactory results. [But] the rule should not be so broadened as to produce confusion or injustice. . . . However, our system of practice should not permit the downfall of a cause because of an overruled motion for summary judgment, which in the light of a conventional trial on the merits appears to have been defectively defended against by insufficient pleadings, depositions or affidavits. *Many of the considerations militating against the review of a trial court's action overruling a motion for summary judgment after the case has been tried in the conventional manner before judge or jury are also applicable when the final judgment appealed from is one of dismissal.* The safer rule is one restricting the [*Tobin-Garcia*] doctrine to its factual situation . . . , that is, to cases in which motions for summary judgment have been filed by all of the real parties at interest and the appeal is prosecuted from a judgment granting one or more of them.

*Id*. (emphasis added).

Based on *Ackermann*, two of our sister courts have refused to consider an order denying summary judgment in appeals following orders of dismissal. *See Bechem v. Reliant Energy Retail Servs., LLC*, No. 01-18-00878-CV, 2019 WL

4065274, at *5 (Tex. App.—Houston [1st. Dist.] Aug. 29, 2019, pet. denied) (mem. op.) (citing *Ackermann* and stating, "[W]hen a trial court denies a motion for summary judgment and subsequently dismisses the case, as here, the order denying the motion for summary judgment is not reviewable on appeal."); *Dolenz v. Tex. St. Bd. of Med. Examiners*, 899 S.W.2d 809, 812 (Tex. App.—Austin 1995, no pet.) (citing *Ackermann* and stating, "[A]n appellate court cannot review a trial court's action overruling a motion for summary judgment when the trial court has rendered an order of dismissal.").

Like our sister courts did in those cases, based on similar circumstances here, we conclude we may not review the trial court's order denying Snell's summary judgment motions on his false imprisonment claims, as his appeal follows an order of dismissal and final judgment on those claims. *See Ackermann*, 403 S.W.2d at 365; *see also Bechem*, 2019 WL 4065274, at *5; *Dolenz*, 899 S.W.2d at 812.[16]

## B.    Entry of Take-Nothing Judgment After Orders of Dismissal

Snell also argues the trial court erred by dismissing his claims for failing to serve an expert report under TMLA section 74.351.[17]

---

[16] Even if we could review that matter, we have recently concluded that where Chapter 574 applies, an order of protective custody issued by a mental-health court is an absolute bar to a false-imprisonment claim. *See Loya v. Hickory Trail Hosp., L.P.*, No. 05-20-00378-CV, 2022 WL 17335694, at *14 (Tex. App.—Dallas Nov. 29, 2022, no pet. (concluding, in a case involving allegations somewhat similar to Snell's, that Chapter 574 applied and the order of protective custody issued by the mental-health court was an absolute bar to the claimant's false-imprisonment claim).

[17] *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b).

### 1. TMLA and Section 74.351 Expert Reports

The TMLA requires that HCLC claimants, to avoid dismissal, serve an expert report addressing liability and causation as to each defendant within 120 days after the defendant files an original answer. *Rogers v. Bagley*, 623 S.W.3d 343, 348 (Tex. 2021); *see* TEX. CIV. PRAC. & REM. CODE § 74.351.

> Section 74.351 of the TMLA states, in pertinent part:
>
> (a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed or a later date required under Section 74.353, serve on that party or the party's attorney one or more expert reports. . . .[18]
>
> (b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:
>
> (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and
>
> (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

TEX. CIV. PRAC. & REM. CODE § 74.351. Section 74.351 defines various terms, including by defining "[c]laim" as "a health care liability claim." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(2). While "health care liability claim" is not defined in section 74.351, it is defined in the TMLA, which states:

---

[18] *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b).

–11–

> "[h]ealth care liability claim" means a cause of action[19] against a health care provider[20] or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care,[21] or health care,[22] or safety or professional or administrative services directly related to health care,[23] which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or in contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

---

[19] The TMLA does not define "cause of action," but the phrase generally "refers to the 'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *In re Jorden*, 249 S.W.3d 416, 421 n.19 (Tex. 2008) (orig. proceeding) (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939)).

[20] "Health care provider" is defined as "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care," and includes various positions and roles. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12)(A)–(B) (definition includes a registered nurse, dentist, podiatrist, pharmacist, chiropractor, optometrist, health care institution, or health care collaborative certified under Texas Insurance Code chapter 848, as well as an officer, director, shareholder, member, partner, manager, owner, or affiliate of a health care provider or physician, and an employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship).

[21] The TMLA defines "[m]edical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(19). The Texas Occupations Code defines "[p]racticing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly charges money or other compensation for those services." TEX. OCC. CODE § 151.002(a)(13).

[22] "Health care" is defined as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10).

[23] "Safety" is not defined in the TMLA but, in connection with an earlier version of the Act, the Texas Supreme Court referred to "safety" according to its common meaning as "the condition of being 'untouched by danger; not exposed to danger; secure from danger, harm or loss.'" *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005) (quoting *Safety*, BLACK'S LAW DICTIONARY 1336 (6th ed. 1990)). "Professional or administrative services" are defined as "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs." *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(24). "'Directly related' means an 'uninterrupted, close relationship or link between the things being considered.'" *Coming Attractions Bridal & Formal, Inc. v. Tex. Health Res.*, 595 S.W.3d 659, 665 n.23 (Tex. 2020) (quoting *Weems*, 575 S.W.3d at 365). Finally, the Texas Supreme Court held that the phrase "directly related to health care" modifies the terms immediately before it—professional or administrative services—but not the word safety. *See Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 185 (Tex. 2012).

–12–

Recently, in *Lake Jackson Medical Spa, Ltd. v. Gaytan*, 640 S.W.3d 830 (Tex. 2022), the court stated:

> As we have repeatedly observed, this definition [of HCLC] includes three basic elements: (1) the defendant must be a physician or health care provider; (2) the claim must concern "treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care"; and (3) the defendant's conduct must proximately cause the claimant's injury or death.

*Id*. at 840 (quoting *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179–80 (Tex. 2012)).

### 2.    Standard and Scope of Review

The court also stated:

> Whether a pleading asserts a health care liability claim presents a question of law courts review de novo. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019). To answer that question, we must focus on the claim's "underlying nature . . . rather than its label." *Id*. To determine the claim's underlying nature, we must consider the "entire court record," including "the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012).

*Id*. at 836.

We "look first to the pleadings," *Loaisiga*, 379 S.W.3d at 259, and consider the underlying nature and gravamen of the plaintiff's claim, not its label, focusing on "whether the gravamen of [the plaintiff's] complaint is a 'claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care.'" *Weems*, 575 S.W.3d at 363–

–13–

64 n.21 (quoting TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13), and citing *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016)).

As indicated, we are to look at the "entire court record," *see Lake Jackson Med. Spa*, 640 S.W.3d at 836; *Loaisiga*, 379 S.W.3d at 258, including an amended petition filed after a motion to dismiss, except when procedural rules prohibit such a filing. *See Lake Jackson Med. Spa*, 640 S.W.3d at 839.[24]

Unlike that case, *see id*. at 836–39, here, the parties do not dispute whether we are to consider Snell's original petition, amended petition, or both. But the court's reasoning in *Lake Jackson Medical Spa* suggests we may consider both, as both pleadings are part of the "entire court record." *See id*. at 839 (stating an amended petition "nevertheless comprises part of the 'entire court record' courts should consider" when making the determination whether claims are HCLCs). Thus, as part of the entire record, we consider Snell's original petition and amended petition when determining whether his claims are HCLCs.

### 3. TMLA's Rebuttable Presumption

In *Loaisiga*, the court held that the TMLA "essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is

---

[24] In the context of a dispute regarding whether an amended petition could be considered, the court stated, "Except when our procedural rules prohibit such a filing, courts deciding a section 74.351 dismissal motion should consider an amended petition when determining the claims' underlying nature." *Lake Jackson Med. Spa*, 640 S.W.3d at 839.

based on facts implicating the defendant's conduct during the course of a patient's care, treatment or confinement." *Loaisiga*, 379 S.W.3d at 256. The court also stated:

> But the presumption is necessarily rebuttable. In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (*i.e.,* the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both.

*Id.*

### 4.    Application

### a.    Rebuttable Presumption Applies

As a threshold matter, we must determine whether the rebuttable presumption applies in this case. Appellees argue it does and made this argument in the trial court, in their appellate brief, and at oral argument in this appeal. Snell disputed this in his response to BHC, UHS, and Cawthon's motion to dismiss but did not address this issue in his appellate briefs or at oral argument.

There is no dispute that appellees are health care providers. And, while Snell maintains he did not consent to treatment, there appears to be no dispute that Snell was a patient, at least as "patient" is defined in the Mental Health Code. *See* TEX. HEALTH & SAFETY CODE § 571.003(16) (defining "[p]atient" as "an individual who is receiving voluntary or involuntary mental health services under this subtitle.").[25]

---

[25] "Patient" is not defined in the TMLA. Although Snell claims Cawthon did not seek his consent as a patient, and he denies providing it, the record regarding the facts and circumstances surrounding their interaction implies otherwise. *See Lake Jackson Med. Spa*, 640 S.W.3d at 841–42 (stating, even in the absence of an express authorization, a physician-patient relationship may be implied through conduct and

Finally, the record shows all of Snell's claims are based on facts implicating appellees' conduct in the course of his care, treatment or confinement. For example, in Snell's response to Timberlawn's motion to dismiss, Snell stated the "legal foundation of [his] claims lies in Timberlawn's [v]iolation of express provisions of the Texas Mental Health Code" and stated the factual basis of his claims are principally set forth in paragraphs sixty-three through seventy-seven of his amended petition. Those paragraphs refer to Snell's December 10, 2018 transfer to the mental health facility and to various events Snell alleges did or did not occur during his confinement while there, including an alleged lack of a probable cause hearing, a failure to discharge him on December 13, 2018, as he argues was required, and to him twice being physically restrained and drugged against his will, once on December 14, 2018, and once on December 20, 2018.

---

circumstances demonstrating the parties' agreement). In an affidavit Snell submitted in connection with his summary judgment motions, Snell described his and Cawthon's December 9, 2018 interaction as follows, stating, in part:

> While at Baylor, at approximately two p.m. that afternoon, I recall being visited by a woman I believed was a doctor working for Baylor. Other than possibly introducing herself as a "doctor," the woman did not otherwise identify herself or state her purpose. I later learned that the "doctor" who visited me was Defendant Heather Cawthon, LPC, Ph.D. ("Cawthon"). I have since learned she was employed by other Defendants in this case.
>
> . . .
>
> Cawthon's visit lasted only a few minutes. She asked me a series of questions, all of which I answered.

Based on these circumstances, where their interaction occurred in a hospital room, and when Snell apparently willingly answered all of Cawthon's series of questions while believing her to be a doctor, we conclude, despite Snell's arguments to the contrary, that a healthcare provider-patient relationship existed between Cawthon, and by relation, with BHC, her alleged employer. *See id.*

–16–

Based on this record, we conclude the rebuttable presumption applies here. *See Pruett v. Pittman*, No. 05-13-00634-CV, 2014 WL 2807983, at *2–3 (Tex. App.—Dallas June 18, 2014, no pet.) (mem. op.) (concluding presumption applied in case alleging psychiatric evaluation and report were fraudulent, which appellant claimed caused him injury by requiring him to remain confined in mental hospital for longer than necessary and to take psychotropic drugs he alleged he did not need).

### b. Was Presumption Rebutted?

When, as here, the presumption applies, the burden shifts to Snell to rebut it by showing his claims are not based on the defendant's departure from accepted standards of medical care or health care. *See Lake Jackson Medical Spa*, 640 S.W.3d at 844 (citation omitted). "To decide whether the claimant has met that burden, we 'first determine whether expert medical or health care testimony is needed to establish the requisite standard of care and breach.'" *Id*. (citation omitted). If expert testimony is required, the claim is a HCLC. *Id*. (citation omitted). But while "[t]he necessity of expert testimony prevents the claimant from rebutting the [TMLA's] presumption . . . depending on the 'totality of the circumstances,' a claimant might not rebut the presumption even when expert testimony is not required[,]" as a claim constitutes an HCLC "when the conduct complained of is an 'inseparable or integral part of the rendition of health care.'" *Id*. (citations omitted).

In *Lake Jackson Medical Spa*, the court concluded that expert testimony was required, but the court also concluded that even if expert testimony was not required,

–17–

the claims at issue there were HCLCs because all of the conduct about which the claimant complained was inseparable from the rendition of health care. *Id*. While the case involved complaints regarding voluntary dermatological care, not an involuntary mental health commitment, the court's analysis in *Lake Jackson Medical Spa* is instructive. The court stated, in part:

> [Claimant] alleges that the defendants failed to "properly evaluate" her skin condition "pursuant to established standards of dermatological care," [and] failed to "properly assess, document, and/or request" her medical history. . . . The proper and applicable standards of "dermatological care," reliance on medical histories, . . . as well as whether defendants' conduct fell below those standards, are all matters that require expert testimony; indeed, it "would blink reality" to conclude otherwise. *Tex. W. Oaks*, 371 S.W.3d at 182.

*Lake Jackson Med. Spa*, 640 S.W.3d at 845.

Snell's claims are somewhat analogous, because he claims, in essence, that Cawthon failed to properly evaluate him on December 9, 2018, and that his involuntary commitment, physical restraint, and forcible medication that then followed from her evaluation violated the standards established by Chapter 574 of the Texas Mental Health Code. In his original and amended petitions, for example, Snell claims "Cawthon could not have reasonably concluded from the [December 9, 2018] interview that [Snell] was violent or likely to cause serious harm to himself or anyone else." In his amended petition, he also claims "Cawthon appears to have violated several provisions of Section 681.041 ("Code of Ethics") of the Rules Relating to the Licensing and Regulation of Professional Counselors (Texas Administrative Code)[,]" and "used her license in gaining access to [him] at Baylor."

–18–

Given the record here, one might well determine it would "blink reality" to conclude that Snell's claims are not matters that require expert testimony. *See id.*, 640 S.W.3d at 845; *Tex. W. Oaks*, 371 S.W.3d at 182; *see also Pruett*, 2014 WL 2807983, at *4 (concluding, in a case involving allegations somewhat similar to Snell's, "appellant must present expert testimony to prove his claims because they implicate the standard of care relevant to the assessment of a mental patient, obtaining consent to conduct a psychiatric evaluation, and diagnosing a psychiatric condition").

But even if we agreed, as Snell argues, that no expert testimony is required, we conclude, based on the record here, the conduct about which Snell complains is "an inseparable or integral part of the rendition of health care," and as such, his claims constitute HCLCs. *See Lake Jackson Med. Spa*, 640 S.W.3d at 846 (concluding appellant did not rebut the presumption his claim was an HCLC); *see also Loya*, 2022 WL 17335694, at *5 (stating the claimant "cannot maintain such a claim without reference to [the provider's] standard of care"); *Pruett*, 2014 WL 2807983, at *3–4 (concluding claims "implicat[ing] how [the psychiatrist] conducted the psychiatric evaluations, whether he followed proper procedures, whether he obtained appellant's consent before conducting the evaluations, and his diagnosis and recommendations for treatment" were "inseparable from appellant's health care."); *Broxterman v. Carson*, 309 S.W.3d 154, 158 (Tex. App.—Dallas 2010, pet. denied) (concluding claims for medical malpractice, various intentional

–19–

torts, and statutory and civil rights violations were HCLCs when the focal point of appellant's claims was her treatment while hospitalized at mental health facility and the essence of her claims was negligence in the rendition of health care services; stating, "The fact that some of the alleged acts were done knowingly or indifferently does not change the nature of the claim."); *Groomes v. USH of Timberlawn, Inc.*, 170 S.W.3d 802, 805–06 (Tex. App.—Dallas 2005, no pet.) (concluding trial court properly determined claims for false imprisonment, intentional infliction of emotional distress, and abuse of process were HCLCs because allegations regarding improper detention and administration of medication were "inextricably intertwined" with medical treatment and provision of medical care).

We are mindful of the serious and important liberty interests at stake in this and similar cases. But on the record before us, we have no choice but to conclude the trial court did not err in dismissing Snell's claims against appellees for his failure to serve an expert report under the TMLA.

## III. CONCLUSION

We overrule Snell's issues and affirm the trial court's judgment.


200915f.p05                                    /Ken Molberg/
                                               KEN MOLBERG
                                               JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAMES R. SNELL, Appellant

No. 05-20-00915-CV          V.

BEHAVIORAL HEALTH
CONNECTIONS, INC.,
UHS OF TIMBERLAWN, INC.,
UNIVERSAL HEALTH SERVICES,
INC., AND HEATHER CAWTHON,
Appellees

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-15454.
Opinion delivered by Justice
Molberg. Justices Myers and Garcia
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee BEHAVIORAL HEALTH CONNECTIONS, INC., UHS OF TIMBERLAWN, INC., UNIVERSAL HEALTH SERVICES, INC., AND HEATHER CAWTHON recover their costs of this appeal from appellant JAMES R. SNELL.

Judgment entered this 5th day of December 2022.

–21–